NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

GARY L. DESROSIERS,                    :         Civ. Action No. 21-11491 (RMB)
                                       :
            v.                         :         **OPINION**
                                       :
RAYMOND ROYCE, et al.,                 :
                                       :
            Respondents                :
                                       :

RENÈE MARIE BUMB, CHIEF UNITED STATES DISTRICT JUDGE

This matter comes before the Court upon Petitioner Gary L. Desrosiers'
("Petitioner") petition for a writ of habeas corpus under 28 U.S.C. § 2254,
challenging his 2009 New Jersey state court conviction.  (Pet., Dkt. No. 1.)
Respondents filed an answer in opposition to habeas relief.  (Answer, Dkt. No. 10.)
Petitioner filed a reply brief and submitted five pretrial transcripts  associated with
Petitioner's second PCR proceedings, which Respondents had not provided with the
answer.  (Reply Brief, Dkt. No. 22.)  Petitioner subsequently filed a motion to
supplement the state court record or alternatively to stay the petition for exhaustion
of state court remedies.  (Mot. to Supplement, Dkt. No. 23.)  This Court denied the
motion to stay, and denied Ground Five on the merits by separate order.  Therefore,
the Court will address Plaintiff's remaining claims.  For the reasons set forth below,
the Court denies the petition for writ of habeas corpus.

## I.   PROCEDURAL HISTORY

On May 10, 2007, a grand jury in the State of New Jersey, Law Division, Burlington County returned a thirteen count indictment charging Petitioner with two counts of second-degree sexual assault in violation of N.J.S.A. 2C:14-2b; three counts of second-degree endangering the welfare of a child in violation of N.J.S.A. 2C:24-4a; four counts of first-degree aggravated sexual assault in violation of N.J.S.A. 2C:14-2a(2)(a); and four counts of third-degree aggravated criminal sexual contact in violation of N.J.S.A. 2C:14-3.  (Ra1, Dkt. No. 10-3.)  In January 2008, Petitioner was tried by a jury before the Honorable John A. Almeida, J.S.C.  (Rta3, 4, 5, 6, Dkt. Nos. 10-56, 57, 58, 59.)  The jury found Petitioner guilty on all counts of the indictment.  (Ra3, Dkt. No. 10-5.)  Petitioner obtained new counsel for sentencing and post-trial motions.  (Rta7, Dkt. No. 10-60.)  On January 9, 2009, Judge Almeida denied Petitioner's motion for a new trial.  (Rta8, Dkt. No. 10-61 at 11-12), and sentenced Petitioner to a 45-year aggregate term of imprisonment, subject to an 85% parole ineligibility period and community parole supervision for life.  (*Id.* at 24-28.)

The Appellate Division denied Petitioner's direct appeal on June 8, 2011, and the Supreme Court of New Jersey subsequently denied Petitioner's petition for certification.  (Ra13, Dkt. No. 10-15; Ra14, Dkt. No. 10-16.)  Petitioner then filed a motion for post-conviction relief.  (Ra15, Dkt. No. 10-17.)  The Honorable Terrence R. Cook, J.S.C., denied the petition in part and granted a limited evidentiary hearing on two claims related to defense counsel's failure to obtain counseling and work

records. (Ra20, Dkt. No. 10-22.) The evidentiary hearing was held in September 2013. (Rta10, Rta11, Rta12, Dkt. Nos. 10-63, 64, 65.) After the hearing, Judge Cook issued a written opinion denying Petitioner's motion for post-conviction relief. (Ra28, Dkt. No. 10-30.) On March 18, 2016, the Appellate Division denied Petitioner's appeal, and the New Jersey Supreme Court subsequently denied Petitioner's petition for certification. (Ra38, Dkt. No. 10-40; Ra14, Dkt. No. 10-16.)

Petitioner filed a second motion for post-conviction relief, which was denied by Judge Cook on October 17, 2017. (Ra40, Dkt. No. 10-42.) Petitioner appealed, and the Appellate Division denied the appeal. (Ra42, Dkt. No. 10-44.) Petitioner filed a petition for certification to the Supreme Court of New Jersey, (Ra43, Dkt. No. 10-45), which was denied on March 26, 2021. (Ra44, Dkt. No. 10-46.) Petitioner's petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 1) is now before the Court.

## II.   Appellate Division's Findings of Fact on Direct Appeal

By statute, determinations of factual issues by a state court are presumed to be correct on habeas review. 28 U.S.C. § 2254(e)(1). The petitioner has the burden to rebut the presumption of correctness by clear and convincing evidence. (*Id.*) Therefore, the Court presumes the correctness, subject to rebuttal by clear and convincing evidence, of the following findings of fact by the Appellate Division on Petitioner's direct appeal. The Court notes that the Appellate Division referred to the victim by the fictious name "Diana." (Ra13, Dkt. No. 10-15 at 4, n. 1.) This Court will do the same throughout this opinion.

In essence, defendant was caught by his mother-in-law in the act of a sexual encounter with his stepdaughter. The child corroborated the incident, as well as other prior sexual attacks by defendant, in her trial testimony. Defendant, on the other hand, denied initiating any sexual contact with the child. He contended that she had falsely accused him of sexual wrongs in an effort to manipulate him and his relationship with her mother. We discuss the facts with these competing theories in mind.

In August 2000, defendant and the child's mother, B.E., were married. One month prior to the marriage, B.E. and her daughter D.P., who was then ten years old, moved into defendant's four-bedroom home in Browns Mills. Defendant had been living in the home with his two minor sons, both of whom moved out of the residence shortly after the marriage. After the households combined, Diana began to exhibit behavioral problems. Those problems were exacerbated after her mother gave birth to a son, fathered by defendant, in August 2001. A few months later, in January 2002, Diana moved in with her own father, R.P. The mother explained that, at the time, she thought Diana's "outbursts" were attributable to a number of experiences, i.e., a new school, new friends, a new stepdad, and a new baby.

In August 2002, Diana's maternal grandmother, J.E., moved into the marital home. A short time later, extensive termite damage was discovered in the master bedroom, causing defendant and his wife to take over the room that Diana had previously occupied. Consequently, by the summer of 2006, Diana was sleeping in the living room on the occasions when she stayed overnight with defendant, her mother, and her grandmother.

On September 9, 2006, Diana went to sleep on the couch in the living room at approximately 9:30 or 10:00 p.m. Shortly thereafter, her grandmother, J.E., who had retired to her own bedroom at about 7:00 or 8:00 p.m., went to the kitchen to get a drink. J.E. then observed defendant "humping over [her] granddaughter," for "about forty-five seconds." She asked, ""[w]hat the hell's going on[?]" J.E. then watched defendant pull up the front of his pajama

bottoms.  Believing that she had just seen defendant and Diana "having oral sex," J.E. proceeded to hit and punch defendant and call him foul names.

That night, Diana, who was then still lying on the couch, did not say anything.  When she made eye contact with her grandmother, she "pulled the blanket over her head." J.E. called for B.E., who had been asleep in the bedroom. When J.E. told her what she had seen, B.E. backed up into a storage cabinet, turned sideways and slid down the cabinet, wrapped her arms around her body, and began rocking back and forth saying, "God, no, please, God, no."

At that point, defendant went to the kitchen, got his keys, and left the house.  He then came right back in the house, grabbed a knife from a knife block on the kitchen counter, and went out the door again.  B.E. called 9-1-1, and the police arrived within about ten minutes.

Pemberton Township Police Officers Vincent Cestare and Brian Warrick arrived at the family's home shortly before midnight.  A "flash," i.e., an immediate notification, was communicated over the police radio, advising that the police were looking for defendant and that he should be detained.  Shortly thereafter, the police shift supervisor, Officer Gregory Hale, also arrived at the home.  Moments after Officer Hale's arrival, defendant telephoned the house, and J.E. answered the phone.  Defendant asked to speak to the police, and J.E. handed the phone to Officer Hale.  According to Officer Hale's trial testimony, the first thing defendant said to him on the call was, "I f[***]ed up."

Officer Hale informed defendant that a "flash" had been put out for him, and that he should return to the house. When defendant arrived back at the home about eight to ten minutes later, he was taken into custody.  An indictment ensued, charging defendant with the aforementioned thirteen counts of sexual offenses and other crimes.

In her testimony at trial, Diana stated that, on September 9, 2006, "[s]he was woken up by [defendant] rubbing his penis on her chest." She estimated that "it was probably going on for like 45 minutes to a half hour" before her grandmother walked in.

Diana stated that she loved defendant "like a boyfriend" and that she did not tell anyone that this had happened before because she "didn't want to get him in trouble." She testified that, when she was about ten years old, defendant started to touch her and kiss her "[i]n [her] breast areas and [her] vagina and on [her] lips." She stated that this happened "[e]very weekend that [she] was there." She testified that when she was around twelve or thirteen, the contact progressed to oral sex. She stated that this happened "[a]bout once every weekend."

The child further explained that when she was age fifteen, defendant's sexual contact with her progressed to vaginal intercourse, which she said happened "[e]very once in a while. It only happened like three times." She added that, in a typical weekend, she and defendant would engage in "sexual acts" every day. According to Diana, she thought defendant was going to leave her mother and instead be with her once she turned eighteen.

In his own trial testimony, defendant insisted that he had not sexually assaulted Diana on September 9, 2006, or at any other time. He contended that the child had inappropriately initiated sexual contact with him and, moreover, had fabricated allegations against him as a means of blackmail. Defendant stated that the child's efforts to blackmail or threaten him began approximately one year prior, in 2005.

Defendant described an earlier incident in 2005, in which Diana allegedly came into his bedroom, got into his bed, and fondled him. According to defendant, he yelled at her and told her he was going to tell her mother. He alleged that, in response, Diana cautioned him that "if [he] told her mother anything she was going to tell her [mother B.E.] that [he'd] been molesting her." Defendant further contended that Diana would send him text messages

"almost constantly," so much so that his wife and Diana's father had to intervene to stop them.

With respect to the critical events of the night of September 9, 2006, defendant testified that when he leaned over the couch to give her a hug, Diana "reached up and grabbed [his] crotch." Defendant contended that he responded by grabbing her left wrist with his right hand and telling her to let go. He asserted that "she was pulling at [him] and [he] was trying to get her to let go, then she pulled so hard [he] almost fell on top of her so [he] reached out to brace [him]self." Defendant denied any effort on his part to initiate sexual contact with Diana, or to gratify himself. He also maintained that he told Officer Hale that the child had been attempting to blackmail or threaten him for approximately one year.

In addition to hearing these narratives from the principals (Diana and defendant), the jury also heard testimony from J.E., B.E., the three responding police officers (Cestare, Warrick, and Hale), a detective from the Burlington County Sexual Assault Unit, and a prior co-worker of defendant's. Upon considering these proofs, the jury found defendant guilty on all counts of the indictment.

(Ra13, Dkt. No. 10-15 at 3-9.)

## III.   DISCUSSION

### A.   Standard of Law

The standard for granting a state prisoner's federal habeas corpus petition is governed by 28 U.S.C. § 2254(d), as follows:

[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United
States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

The Third Circuit has directed habeas courts to follow a two-step analysis
under § 2254(d)(1). *Rosen v. Superintendent Mahanoy SCI*, 972 F.3d 245, 253 (3d
Cir. 2020) (citing *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3d Cir.
1999) (*en banc*), *cert. denied* 528 U.S. 824 (1999)).  First, courts should "determine
what the clearly established Supreme Court decisional law was at the time
Petitioner's conviction became final" and "identify whether the Supreme Court
has articulated a rule specific enough to trigger 'contrary to' review." *Id.* at 253
(quoting *Fischetti v. Johnson*, 384 F.3d 140, 148 (3d Cir. 2004)).  "The 'clearly
established Federal law' provision requires Supreme Court decisions to be viewed
through a 'sharply focused lens.'" *Id.*  Clearly established law "refers to the
holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time
of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).
A decision is "contrary to" a Supreme Court holding within 28 U.S.C. §
2254(d)(1), only if the state court applies a rule that "contradicts the governing law
set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are
materially indistinguishable from a decision of [the Supreme Court] and
nevertheless arrives at a [different result.]" *Williams*, 529 U.S. at 405-06. Second,
if Supreme Court precedent is not specific enough to trigger contrary review,

habeas courts should "evaluate whether the state court unreasonably applied the relevant body of precedent." *Rosen*, 972 F.3d at 253 (quoting *Matteo*, 171 F.3d at 888)).

Under § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams*, 529 U.S. at 410). For relief under this provision, the state court's decision "evaluated objectively" must have "resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Rosen*, 972 F.3d at 252 (quoting *Matteo*, 171 F.3d at 890)). A habeas court must frame the "relevant question as whether a fairminded jurist could reach a different conclusion." *Shinn v. Kayer*, 141 S. Ct. 517, 524 (2020) or, in other words, whether "every fairminded jurist would disagree" with the state court. *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021). Stated affirmatively, the standard is whether a fairminded jurist could agree with the state court's decision. *See Brown v. Davenport*, 596 U.S. 118, 135 (2022) (citing *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (for habeas relief under § 2254(d)(1), "a petitioner must persuade a federal court that no 'fairminded juris[t]' could reach the state court's conclusion under this Court's precedents.")

Habeas review is deferential to a state court's determination of facts. 28 U.S.C. § 2254(e)(1) provides that:

> [i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the

> judgment of a State court, a determination of a factual
> issue made by a State court shall be presumed to be
> correct. The applicant shall have the burden of rebutting
> the presumption of correctness by clear and convincing
> evidence.

"The petitioner must show that the state court verdict was based on an unreasonable determination of the evidence and that a reasonable factfinder could not have reached the same conclusion." *Rosen*, 972 F.3d at 252 (3d Cir. 2020) (citing *Campbell v. Vaughn*, 209 F.3d 280, 291 (3d Cir. 2000)).  A petitioner must rebut the presumption that a state court's finding of findings is correct by clear and convincing evidence. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  Finally, where a state court summarily denies a claim on the merits, a habeas court

> must determine what arguments or theories … could have
> supported, the state court's decision; and then it must ask
> whether it is possible fairminded jurists could disagree that
> those arguments or theories are inconsistent with the
> holding in a prior decision of this Court.

*Harrington v. Richter*, 562 U.S. 86, 102 (2011).

## B.    Ground One of the Petition

For his first ground for relief, Petitioner claims that he was denied effective assistance of counsel.  (Pet., Dkt. No. 1 at 11-13.)  Ground One has several parts, addressed below.  There is no dispute that the clearly established Supreme Court precedent governing Sixth Amendment ineffective assistance of counsel claims is *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a defendant has the burden to satisfy a two-part test:  1)  counsel's performance was constitutionally

deficient; and (2) counsel's deficient performance prejudiced the defense. *Id.* at 687. The first prong of the test requires a defendant to establish that counsel's representation fell below an objective standard of reasonableness, as determined by prevailing professional norms and the circumstances of the individual case. *Id.* at 687-88, 690. Moreover, the defendant must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance .. . ." *Id.* at 689. In other words, a defendant must rebut the presumption that the challenged action, under the circumstances, would be "'considered sound trial strategy.'" *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690.

For the second prong of the *Strickland* test, a defendant must establish that counsel's deficient performance prejudiced the defense. *Id.* at 687. This requires a defendant to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 693. If it is easier to dispose of an ineffective assistance of counsel for lack of prejudice, courts may address prejudice first. *Id.* at 670.

> **1.     Whether defense counsel was ineffective by failing to obtain expert medical testimony on the absence of physical evidence**

The State obtained a medical examination of the victim by Dr. Marita Lind, who found "no specific residual to any inappropriate sexual contact." (Pet., Dkt. No. 1 at 11.) Without physical evidence of the alleged sexual assault, Petitioner maintains that his counsel, Kevin Meehan, Esq. ("Mr. Meehan"), negligently failed to call Dr. Lind as a witness or consult with an expert and present expert testimony about the complete lack of physical evidence in this case. (*Id.* at 12.) Respondents contend Petitioner failed to establish the state courts' determination of this claim was based on an unreasonable determination of the facts or that the state courts' determination of this claim was contrary to or involved an unreasonable application of clearly established Supreme Court precedent. (Answer, Dkt. No. 10 at 33-34.) In his reply brief, Petitioner asserts that his counsel's performance was deficient because this case presented a "credibility contest" between a child abuse victim and the defendant, which necessarily requires expert testimony for the defense. (Reply Brief, Dkt. No. 22 at 92-93.)

The PCR Court found that Petitioner's allegations failed to state a prima facie claim of ineffective assistance of counsel, and the Appellate Division on PCR appeal concluded this claim lacked sufficient merit for consideration in a written opinion. (Ra13, Dkt. No. 10-15; Ra38, Dkt. No. 10-40 at 5.) Petitioner has not identified Supreme Court precedent that is materially indistinguishable upon the facts and, therefore, specific enough to invoke "contrary to" habeas review. Therefore, this Court must determine what arguments could have supported the Appellate Division's

decision, and whether a fairminded jurist could agree that those arguments did not involve an unreasonable application of clearly established Supreme Court precedent. *Richter*, 562 U.S. at 102.

The Third Circuit considered a similar claim in *Davis v. Superintendent Graterford SCI*. 839 F. App'x 741, 744 (3d Cir. 2021). In that case, the victim had a medical exam after alleging a series of sexual assaults over the past five or six months. *Id.* The medical exam did not reveal any physical findings of abuse. *Id.* The Third Circuit held that defense counsel's failure to introduce this evidence "failed the first *Strickland* prong" because the medical report contained a caution that the findings did not conclusively support or disprove sexual abuse, thus, presented only inconclusive exculpatory evidence. *Id.* The Third Circuit further held that the defense was not prejudiced by counsel's failure to present the lack of physical evidence of sexual abuse because the medical exam may have been admissible against the defendant as the victim's prior consistent statement of sexual abuse to the medical providers.

Here, the State did not dispute that it had no physical evidence of sexual assault. The State relied on Diana's testimony that Petitioner had not ejaculated during the sexual contact on September 9, 2006. (Rta4, Dkt. No. 10-57 at 77.) In summation, the defense argued this was an unlikely scenario, based on the duration of the sexual encounter. (Rta6, Dkt. No. 10-59 at 17). Moreover, Petitioner testified that he was not rubbing his penis on Diana, rather Diana grabbed his crotch and pulled hard. (Rta5, Dkt. No. 10-58 at 51-52, 60.) The lack of physical evidence was

consistent with either of these scenarios.  Where negative lab reports are not exculpatory of the alleged crime, a petitioner cannot establish prejudice based on the failure to present such reports.  *Jackson v. Conway*, 763 F.3d 115, 154-55 (2d Cir. 2014). Based on this record, a fairminded jurist could agree with the state courts' denial of this ineffective assistance of counsel claim under the *Strickland* test.  This ineffective assistance of counsel claim is denied.

> ### 2.   Whether defense counsel was ineffective by failing to investigate and present mental health evidence concerning the victim's unnatural attachment to Defendant

Petitioner alleges he was denied effective assistance of counsel because defense counsel failed to present mental health records concerning Diana's unnatural attachment to him.  (Pet., Dkt. No. 1 at 12.)  Respondents oppose relief, asserting Petitioner failed to establish the state courts' determination of this claim was based on an unreasonable determination of the facts or was contrary to or involved an unreasonable application of clearly established Supreme Court precedent.  (Answer, Dkt. No. 10 at 33-34.)  In his reply brief, Petitioner submits that he informed defense counsel that Diana's unnatural attachment to him had been brought to the attention of the family's counselor.  (Reply Brief, Dkt. No. 22 at 94-95.)  In her statement to investigators on January 3, 2008, Diana's mother ("B.E.") told investigators that the family sought counseling for Diana's anger issues and also raised the issue of Diana's unnatural attachment to Petitioner.  (*Id.* at 94.)  According to B.E.'s statement to investigators, the counselor explained that it was not unusual for a step-child to have a crush on a step-parent.  (*Id.*)  Thus, Petitioner concludes defense counsel provided

ineffective assistance by failing to obtain the family counselor's records in support of his defense that Diana had an unnatural attachment to him and her parents knew about it. (*Id.*)

The Appellate Division recited the PCR court's determination of this claim and agreed with the conclusion that defense counsel did not breach his duty by failing to obtain the family counseling records for trial.  (Ra38, Dkt. No. 10-40 at 5.)  Therefore, habeas review of the claim is of the PCR court's decision.  The PCR court held:

> Defendant also argues his trial counsel was ineffective for not obtaining the victim's medical records from the counseling center. According to defendant, the victim had psychological issues that should have been explored to attack the victim's credibility. Defendant asserts mental health records would have shown that the victim was angry and unnaturally fixated on defendant. As a threshold issue, such records are protected by [N.J.S.A] 45:14B-28 and [N.J.R.E.] 505 and 517. There is no evidence or showing that such records would have been produced. A party seeking to obtain such records must have compelling circumstances and make a strong showing of need. Further, the records sought were for family counseling, not the victim's individual counseling.
>
> In addition, there is no indication that trial counsel's failure to get mental health records prejudiced defendant as there is no credible evidence that such records would have impacted the victim's credibility or further exculpated petitioner.

(Ra38, Dkt. No. 10-40 at 5.)

Petitioner did not identify Supreme Court precedent specific enough for "contrary to" habeas review.  Therefore, the issue is whether the state courts' decision involved an unreasonable application of the *Strickland* test.  Undisputed testimony at trial established that Diana moved in with her biological father after B.E. married

Petitioner and had a baby.  (Rta4, Dkt. No. 10-57 at 90-91.)  Diana was angry and had

been lashing out at Petitioner and B.E., which B.E. attributed to all the changes in

Diana's life.  (*Id.*)  J.E. initiated Diana's move to her biological father's home because

Petitioner's home was chaotic.  (*Id.* at 5-6.)  As a result, Diana attended family

counseling with Petitioner and her mother.  (*Id.* at 72-73.)

At trial, Diana testified that she was engaging in sexual activities with Petitioner

in the time period that they were attending family counseling, but she never told the

therapist about it.  (*Id.*)  She never met with the therapist one-on-one because it was

family counseling.  (*Id.*)  There is nothing in the record to suggest the family counseling

records contained any evidence supporting Petitioner's defense that Diana had mental

health issues that caused her to falsely accuse him of sexual molestation.  *See, e.g.*, *Frost

v. Pryor*, 749 F.3d 1212, 1229 (10th Cir. 2014) (affirming state court denial of ineffective

assistance of counsel claim for failure to obtain sex abuse victim's medical records

because the records had little impeachment value for the victim's testimony).

Additionally, Petitioner has not established prejudice from counsel's failure to obtain

the family counseling records because the jury heard undisputed evidence that Diana

suffered from anger issues that caused her to lash out at Petitioner and her mother.

Therefore, a fairminded jurist could agree with the state courts' denial of this ineffective

assistance of counsel claim under the *Strickland* standard, and the ineffective assistance

of counsel claim is denied.

### 3. Whether defense counsel was ineffective by failing to investigate and present Petitioner's alibi defense

Petitioner contends that defense counsel failed to investigate and present evidence supporting his alibi defense to Diana's initial allegations. (Pet., Dkt. No. 1 at 12.) In his reply brief, Petitioner asserts that Diana first gave a statement to police on September 11, 2006, and she said her earliest recollection of sexual encounters with Petitioner was one year prior. (Reply Brief, Dkt. No. 22 at 17.) She told the police she visited her mother every other weekend, and the sexual abuse would occur every night on those weekends, while others were in the house. (*Id.*) At first, she denied having sexual intercourse with Petitioner, but later she admitted that it happened once or twice, and she accused Petitioner of using force. (*Id.* at 18.) She also told investigators that when the family counselor asked if she had been abused, she had denied it. (*Id.*) Diana was interviewed by police again on November 1, 2006. (*Id.* at 19.) Investigators questioned whether she had been honest in her last interview. (*Id.*) Diana acknowledged that she had not been honest. (*Id.*) She said she loved Petitioner and thought of him as her boyfriend. (*Id.*) She further admitted Petitioner had not used force on her. (*Id.*) She told investigators that she had not left out any other details. (*Id.*)

On December 10, 2007, Petitioner rejected the State's plea offer for a seven-year term of imprisonment on Count 10, relying on his alibi defense that he was working on the weekends when Petitioner accused him of sexual assault. (Reply Brief, Dkt. No. 22 at 22.) Eight days later, investigators interviewed Diana for trial preparation. (*Id.*) She disclosed additional sexual activities with Petitioner, some of

which occurred outside the home and in another jurisdiction.  (*Id.* at 23.)  Ultimately, the State chose not to amend the indictment to include additional jurisdictions and made only technical amendments.  (*Id.* at 23-24.)

Petitioner contends that defense counsel was ineffective by failing to demonstrate to the jury a pattern wherein Diana changed her story each time new evidence negating Petitioner's guilt was received.  (Pet., Dkt. No. 1 at 12.)  Defense counsel failed to bring before the jury the fact that Diana suddenly disclosed more allegations after Petitioner asserted an alibi defense, and after he had rejected the prosecutor's favorable plea offer.  (*Id.*)

In opposition to this claim, Respondents argue the PCR court properly held that Petitioner's work records were not relevant to the case because Diana did not allege specific times or dates when the sexual abuse occurred.  (Answer, Dkt. No. 10 at 43.)  Instead, she alleged generally that the assaults began when she was nine or ten years old and progressed in intensity until she believed she had a genuine romantic relationship with Petitioner.  (*Id.* at 43-44.)  Rather than an alibi defense, defense counsel sought to undermine Diana's testimony through cross-examination, and cast her as a jealous, manipulative teenager with an unhealthy crush on her step-father.  (*Id.* at 44.)  Defense counsel also attempted to undermine J.E.'s testimony to call into question whether there was any corroborating evidence of Diana's testimony of a sexual relationship.  (*Id.*)  Respondents contend this was sound trial strategy.  (*Id.*)

In his reply brief, Petitioner argues that defense counsel deceived him about his intention to subpoena Petitioner's work records and present an alibi defense to Diana's allegation that sexual abuse occurred every other weekend, late at night at Petitioner's home.  (Reply Brief, Dkt. No. 22 at 63.)  Petitioner told defense counsel that he worked nights on the weekends when Diana visited.  (*Id.*)  Diana testified that Petitioner took her home on Sundays on his way to work, which Petitioner contends corroborates his alibi that he worked on weekends when she visited.  (*Id.* at 65.)  At the PCR hearing, Petitioner's work records were introduced, showing that Petitioner worked 12-hour night shifts, 7:00 p.m. to 7:00 a.m., every other weekend.  (*Id.* at 66.)  Petitioner asserts the state courts never addressed this evidence.  (*Id.*)  Petitioner further claims he presented the PCR court with work records showing he was working nights on the exact dates when Diana alleges she was assaulted by Petitioner between May 13, 2002 and March 24, 2006.  (*Id.* at 70-71.)

Petitioner contends the state courts erred by not making the following factual determinations from the PCR hearing:  1)  the "diverse dates" in the indictment were predicated solely on Diana's initial interview; 2) the courts did not consider that Diana changed her allegations after defense counsel notified the State of Petitioner's alibi; 3) the state courts failed to acknowledge Diana's testimony placed her at Petitioner's residence on the weekends when he worked; 4) the state courts made no factual finding that Petitioner's work records established the exact dates Diana was present at his home; 5) the state courts made no findings of fact based on Petitioner's

employer's testimony that he worked from 7:00 p.m. to 7:00 a.m. on those weekends; and 6) the state courts did not address inconsistencies in defense counsel's pretrial statements and his testimony at the PCR hearing.  (Reply Brief, Dkt. No. 22 at 73-74.) Petitioner contends defense counsel's purported strategy was unreasonable because it was based on almost no investigation and no understanding of the salient facts.  (*Id.* at 74.)  Petitioner has not identified Supreme Court precedent specific enough to trigger "contrary to" habeas review.  Therefore, the issue is whether the state courts reasonably determined the facts and reasonably applied the facts under the *Strickland* standard for ineffective assistance of counsel claims.

Habeas review is of the highest reasoned state court determination of the claim. The Appellate Division on PCR appeal held:

> On appeal, defendant argues that the PCR judge erred by failing to find his trial counsel was ineffective for not obtaining employment records and the victim's medical records. Defendant argues, both through counsel and on his own, that his trial counsel's "strategy" resulted in an unreliable verdict in that the victim's credibility was not effectively challenged and his alibi defense was foregone. We disagree.
>
> In his decision, the judge addressed the work records argument:
>
>> The [c]ourt finds defendant's argument as to work records to be without merit. Defendant failed to present any competent evidence that he was at work the night of September 9, 2006. Thus, he failed to establish how counsel's failure to obtain work records related to September 9, 2006, was deficient. Similarly, defendant failed to establish how trial counsel's performance was deficient for failing to obtain work

records for the diverse date offenses. As the State argued, none of the records established defendant worked for a twenty-four hour period on any weekend. In other words, defendant failed to establish that he could not have committed the offenses due to his work schedule. Because the offenses occurred on diverse dates, none of which are known, defendant's work records are irrelevant. As such, the [c]ourt finds no error in trial counsel's failure to obtain work records, subpoena record custodians[,] or cross-examine the victim's mother on the work records. Rather, trial counsel adequately explained that his decision was strategic. Trial counsel testified that he [chose] not to utilize work records[] because he believed work records were irrelevant because of the diverse date offenses. Trial counsel also testified that utilizing the work records to show petitioner tried to stay away from the victim on weekends she would be at his home[] would allow the jury to focus why petitioner was seen with the victim on the night of the alleged incident.

. . .

We apply the *Strickland* standard and review the reasonableness of counsel's assistance with "a heavy measure of deference to counsel's judgments." *State v. Martini*, 160 N.J. 248, 266, 734 A.2d 257 (1999) (quoting *Strickland*, *supra*, 466 U.S. at 691, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695). The judge applied this standard and concluded that the defendant's arguments did not support a finding of ineffective assistance of counsel. The judge's conclusion that trial counsel's tactical decision to not obtain the records had no adverse impact upon the result of the trial is amply supported. We conclude our analysis by repeating those precepts that guide reviewing courts in determining "ineffective assistance of counsel" claims. Effective representation is not synonymous with errorless representation. An attorney may make decisions in the lens of hindsight that were debatable or even erroneous. For any error by counsel to be constitutionally significant, it must undermine the fundamental fairness of the proceeding. *Strickland*, *supra*, 466 U.S. at 693, 104 S. Ct. at 2067, 80 L.

> Ed. 2d at 697. The competency standard enunciated by *Strickland* is both broad and flexible. *Ibid.* It is intended to encompass varied factual scenarios and circumstances. The proper test is whether counsel's advice was within the range of competence required of attorneys in criminal cases. While attorneys are expected to fulfill their duty of competent representation, a conviction should not be overturned unless there was a breach of that duty that mattered. Here we conclude, as did Judge Cook, that there was no breach of duty, nonetheless, one that mattered.

(Ra1,8 Dkt. No. 10-40 at 4-5.)

The state courts reasonably determined that Petitioner's work records were not exculpatory. The record supports the finding that Diana did not identify any of the "diverse dates" over the course of five years where Petitioner engaged in sexual acts with her. Her testimony was that the sexual acts primarily occurred late at night on weekends when she stayed with her mother and Petitioner, after Petitioner got home from work late at night. (Rta4, Dkt. No. 10-57 at 59, 64-66.) B.E. and J.E. testified that Diana stayed with them whenever she wanted to, they were not strict with the agreement that she would stay with them only every other weekend. (*Id.* at 6, 91-92.) Petitioner did not present evidence at the PCR hearing that he worked 7:00 p.m. to 7:00 a.m. *every weekend* from the time Diana was ten years-old until the incident on September 9, 2006.[1] Furthermore, Petitioner did not establish the exact dates when

---

[1] At the PCR hearing, Petitioner presented testimony that he was a dispatcher at Division of Central Communications in Burlington County, and dispatchers had every other weekend off on night shifts from 7:00 p.m. to 7:00 a.m. (Rta10, Dkt. No. 10-63 at 9.) He also worked some power shifts, lasting 8-hours, which were assigned as needed. (*Id.*) The testimony showed Petitioner was a night shift worker from May 13, 2002 through March 24, 2006, and he worked every other weekend, primarily on 12-hour shifts but occasionally on 8-hour shifts. (*Id.* at 7, 8, 11, 13.) Petitioner also worked as an EMT at Virtua, which

Diana alleged the sexual acts occurred because Diana never indicated any specific date, apart from September 9, 2006, when the sexual acts occurred.  There is not a reasonable probability that the outcome of trial would have been different if Petitioner's work records were presented to the jury in support of his alibi defense because the work records did not establish that Petitioner was never home late at night over the course of five years when Diana stayed in his home.  Based on the record as a whole, a fairminded jurist could agree with the state courts' denial of this ineffective assistance of counsel claim under the *Strickland* standard of review.  This ineffective assistance of counsel claim is denied.

> **4.    Whether defense counsel was ineffective by falsely representing his pretrial investigative efforts to Petitioner and the trial court.**

Petitioner alleges defense counsel never contacted any of the individuals on the proposed witness list for the defense.  (*Id.* at 12.)  Specifically, defense counsel did not interview Margaret Snyder, whose statement to investigators corroborated Petitioner's assertion that he had complained about Diana's unnatural attachment to him, and that Diana had denied anything inappropriate was happening.  (*Id.*)  Defense counsel also failed to interview Petitioner's co-worker, Madeline Esposito, who told investigators Petitioner did not want to go home at night because he had problems

---

had only saved his payroll records for April 25, 2004 through February 11, 2006.  (Dkt. No. 10-63 at 18.)  Most of Petitioner's shifts were 12-hour shifts, but the time of his shifts changed each pay period.  (*Id.* at 23.)

with Diana. (*Id.*)[2]  Respondents oppose relief on this claim because Petitioner failed to establish the state courts' determination of this claim was based on an unreasonable determination of the facts or that the state courts' determination of this claim was contrary to or involved an unreasonable application of clearly established Supreme Court precedent. (Answer, Dkt. No. 10 at 33-34.)

In his reply brief, Petitioner explains that the State attacked his defense about Diana's inappropriate behavior toward him because he never told anyone about it before the September 9, 2006 incident. (Reply Brief, Dkt. No. 22 at 95.)  Therefore, he concludes defense counsel was ineffective by failing to call witnesses who would corroborate his complaints about Diana's inappropriate behavior. (*Id.* at 95-98.)  In particular, Petitioner submits that Margaret Snyder, who lived with Diana and her father when she was not at Petitioner's home on weekends and vacations, would have testified that Diana denied Petitioner was abusing her. (*Id.* at 96.)

Petitioner did not identify Supreme Court precedent specific enough to trigger "contrary to" habeas review.  The *Richter* rule applies because the state courts

---

[2] Petitioner also claimed his counsel's decision to call as a witness his co-worker, Arlene Almacare, constituted deficient performance because her testimony was more prejudicial than probative.  Petitioner did not offer any further explanation of this claim.  For the sake of completeness, this Court notes Ms. Almacare testified that she worked with Petitioner and, on one occasion, she heard him on the phone with Diana, telling Diana hat her mom told her to stop texting him, and that he needed her to stop texting him. (Dkt. No. 10-59 at 74-76.)  On cross-examination Ms. Almacare testified that she overhead a phone message Diana left for Petitioner, in a really weird voice, telling him she loved him. (*Id.*)  This testimony was consistent with both Petitioner's claim that Diana was pursuing him, and Diana's claim that after he started a sexual relationship with her, she loved him like a boyfriend.  This Court determines that there is not a reasonable probability the outcome of the trial would have been different if Ms. Almacare had not testified.

24

summarily denied this claim on the merits.  Therefore, this Court must identify arguments that could have supported the state courts' denial of this claim and determine whether a fairminded jurist could agree that the state courts reasonably applied the *Strickland* ineffective assistance of counsel standard.  562 U.S. at 102.

Presenting Margaret Snyder's testimony that Diana never disclosed Petitioner's abuse to her before September 9, 2006 was not likely to change the outcome of the trial because Diana testified that she never told anyone that Petitioner was abusing her.  (Rta4, Dkt. No. 10-57 at 63.)  The defense had sufficient basis, without Ms. Snyder's testimony, to impeach Diana's allegations of sexual abuse on the basis that she never told anyone about it before September 9, 2006.  On cross-examination, Diana explained she did not tell anyone about the abuse because she did not think anyone would believe her, and because she loved Petitioner and did not want to get him in trouble.

Madeline Esposito's testimony was similarly unlikely to have affected the outcome of trial.  If Madeline Esposito had testified that Petitioner did not want to go home at nights because he wanted to avoid Diana, the State was likely to impeach this testimony because Diana, her mother, and J.E. testified that Petitioner spent a lot of time with Diana.  Furthermore, this testimony would have invited the prosecutor to argue that Petitioner wanted to avoid going home because his long-term sexual relationship with Diana caused her to constantly seek his attention, and he feared he would get caught.  Therefore, there is a reasonable argument that could have supported

the state courts' summary denial of this ineffective assistance of counsel claim, and a fairminded jurist could agree that the state court reasonably applied the *Strickland* ineffective assistance of counsel standard in denying this claim. This ineffective assistance of counsel claim is denied.

     **5.    Whether defense counsel was ineffective by failing to hire an expert to diagram Petitioner's house.**

Petitioner asserts that a diagram of his home would have assisted the jury in understanding the improbability of Diana's allegations. (Pet., Dkt. No. 1 at 12.) Respondents oppose relief, noting that defense counsel testified he did not want to use the floor plan of the home because he wanted the jury to believe that J.E. witnessed the events from afar, so he could call into question what she was able to see. (Answer, Dkt. No. 10 at 47.) Defense counsel asserted Petitioner's floor plan would have revealed that J.E. had a close view of Petitioner and Diana engaged in sexual activity. (*Id.*) Thus, Respondents conclude this ineffective assistance of counsel claim was properly denied by the state courts. (*Id.* at 48.) In his reply brief, Petitioner counters that the diagram would have shown J.E. was so close to the couch where she saw Petitioner "humping over" Diana that she would have seen his exposed penis if Diana's testimony were true. (Reply Brief, Dkt. No. 22 at 86-88.) Petitioner did not identify a Supreme Court case specific enough to invoke "contrary to" habeas review.

The PCR court and Appellate Division summarily rejected this claim on the merits. Thus, the *Richter* rule applies, and this Court must determine if there were arguments upon which the state courts could reasonably have denied this claim. 562

U.S. at 102.  A diagram of the house was unlikely to discredit J.E.'s  testimony of what she saw in the living room on September 9, 2006, because what she could see depended not only on how close she was to Petitioner and Diana, but on their orientation to each other, which J.E. described in her testimony.  (Rta4, Dkt. No. 1-57 at 13-15.) Moreover, the State introduced photographs of the hallway and living room, rendering a diagram of the house of little additional value.  (*Id.* at 19-20.)  On cross-examination, J.E. admitted that although she thought she saw Petitioner and J.E. having oral sex, she did not really know exactly what happened.  (*Id.* at 28-29.)  This was more beneficial to the defense than a diagram of the house showing how near J.E. was to the couch when she witnessed Petitioner humping over Diana on the couch.  Based on the record, there is a reasonable argument that could have supported the state court's rejection of this ineffective assistance of counsel claim, and a fairminded jurist could agree that the state court reasonably applied the *Strickland* ineffective assistance of counsel standard in denying this claim.  Thus, this ineffective assistance of counsel claim is denied.

### 6. Whether defense counsel operated under a financial conflict of interest

In support of his claim that defense counsel provided ineffective assistance based on a financial conflict of interest, Petitioner submitted to the PCR court a pretrial letter from Mr. Meehan, demanding a payment of $15,000.  (Pet., Dkt. No. 1 at 12.)  Mr. Meehan wrote in the letter that he would "devote every penny to assuring that [Petitioner] have quality counsel" and "I can no longer work at the extreme discount

that has become the norm." Petitioner asserts that Mr. Meehan told him he was under pressure from his law partner to "drop the case." Further, Mr. Meehan testified at the PCR hearing that he did not know he could have applied for ancillary services from the Public Defender's Office; and he acknowledged Petitioner would have wanted to hire an investigator, but Petitioner "did not want to cut the check." Respondents oppose relief on this claim because Petitioner failed to demonstrate that the state court decisions were contrary to, or involved unreasonable applications of Supreme Court precedent or resulted in decisions that were based on unreasonable determinations of the facts in light of the evidence presented in the State court proceedings. (Answer, Dkt. No. 10 at 33-34.)

In his reply brief, Petitioner concludes that his failure to pay counsel an additional $15,000 was directly correlated to counsel's failure to conduct any independent pretrial investigation. (Reply Brief, Dkt. No. 22 at 98-99.) Petitioner, citing *United States v. Cronic*, 466 U.S. 648 (1984), contends that prejudice should be presumed where defense counsel failed to subject the prosecution's case to meaningful adversarial testing. (*Id.* at 99.)

This claim was summarily denied on the merits by the PCR court and the Appellate Division on PCR appeal. Therefore, the *Richter* Rule applies, and this Court must determine what arguments could have supported the state courts' denial of this claim, and whether a fairminded jurist could agree that those arguments involved a reasonable application of clearly established Supreme Court precedent. *Richter*, 562 U.S. at 102.

Review of the record shows that Mr. Meehan testified about this claim at the
PCR evidentiary hearing.  He represented Petitioner both in his divorce and the
criminal case, and his letter asking for a $15,000 payment related to both cases.  (Dkt.
No. 10-63 at 60-61, 77.)  Petitioner was honest with Mr. Meehan about the fact that he
did not have money to pay a lawyer, and he tried everything to come up with money.
(*Id.* at 78.)  Mr. Meehan denied that Petitioner's failure to pay him affected his
representation, explaining that as a pool attorney for many years he was used to getting
paid very little, but he still worked just as hard.  (*Id.* at 70-71.)

Petitioner relies on *Cronic* to presume prejudice based on counsel's "financial
conflict" because he was not being paid for his work.  In *Cronic*, the Supreme Court
held that "only when surrounding circumstances justify a presumption of
ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into
counsel's actual performance at trial."  *Id.* at  662.  In *Bell v. Cone*, the Supreme Court
explained,

> [w]hen we spoke in *Cronic* of the possibility of presuming
> prejudice based on an attorney's failure to test the
> prosecutor's case, we indicated that the attorney's failure
> must be complete. We said "if counsel entirely fails to
> subject the prosecution's case to meaningful adversarial
> testing." *Cronic*, *supra*, at 659, 104 S.Ct. 2039 (emphasis
> added).... The aspects of counsel's performance challenged
> by respondent—the failure to adduce mitigating evidence
> and the waiver of closing argument—are plainly of the same
> ilk as other specific attorney errors we have held subject to
> *Strickland*'s performance and prejudice components. In
> *Darden v. Wainwright*, 477 U.S. 168, 184, 106 S.Ct. 2464, 91
> L.Ed.2d 144 (1986), for example, we evaluated under
> *Strickland* a claim that counsel was ineffective for failing to
> put on any mitigating evidence at a capital sentencing

> hearing. *In Burger v. Kemp*, 483 U.S. 776, 788, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), we did the same when presented with a challenge to counsel's decision at a capital sentencing hearing not to offer any mitigating evidence at all.  We hold, therefore, that the state court correctly identified the principles announced in *Strickland* as those governing the analysis of respondent's claim.

535 U.S. 685, 697–98 (2002).

Here, defense counsel presented a constitutionally adequate defense without hiring an investigator or seeking expert testimony.  As reflected in his summation (Rta6, Dkt. No. 10-59 at 14-22),  Mr. Meehan argued it was unlikely that Petitioner and Diana frequently engaged in sexual acts under the same roof with her mother and grandmother for five years without being discovered.  He pointed out that J.E. was incorrect about what she witnessed on September 9, 2006.  Significantly, Mr. Meehan relied on the lack of corroborating evidence, physical and otherwise, of Diana's testimony concerning any other sexual encounter with Petitioner.  The record does not support Petitioner's claim that his failure to pay counsel created a financial conflict of interest that deprived him of a defense.  There is a reasonable argument that could have supported the state courts' rejection of this ineffective assistance of counsel claim, and a fairminded jurist could agree that the state courts reasonably applied the *Strickland* ineffective assistance of counsel standard, and the  *Cronic* standard does not govern this claim.  Therefore, this ineffective assistance of counsel claim is denied.

> **7.  Whether defense counsel was ineffective by failing to consult with and hire experts in cell phone and computer forensics.**

30

Petitioner asserts that he advised his counsel before trial that he possessed cell phones and the computer on which Diana alleged she had received text and email messages from Petitioner.  (Pet., Dkt. No. 1 at 13.)  Diana told investigators she and Petitioner frequently communicated on these devices.  Mr. Meehan did nothing with this information.

Respondents oppose this claim because Diana testified that she deleted emails and text messages to and from Petitioner so she would not get caught by her parents. (Answer, Dkt. No 10 at 47-48.)  Petitioner also admitted that he deleted text messages from Diana.  Respondents contend Petitioner did not show that any emails or text messages would be found on the phones or computer.

In his reply brief, Petitioner states Diana turned her cell phone over to investigators and said that she exchanged messages of a sexual nature with Petitioner.  (Dkt. No. 22 at 81-82.)  When investigators did not find any messages on the phone, Diana changed her story and said she used another phone.  (*Id.*)  The State did not investigate further.  (*Id.*)  Petitioner contends that not only did defense counsel fail to cross-examine Diana about inconsistencies in her testimony regarding text messages on her phone, but he failed to investigate the cell phones Petitioner had in his possession.  (*Id.* at 83.)  Mr. Meehan also failed to bring to light evidence that Petitioner did not want Diana to have a cell phone, it was her mother's decision.  (*Id.* at 84.)  When Petitioner gained possession of his computer in July 2007, he told Mr. Meehan he could examine it, but he never did.

The Appellate Division summarily denied the claim as having insufficient merit to warrant discussion.  Therefore, the *Richter* rule applies, and this Court must determine what arguments could have supported the Appellate Division's decision, and whether a fairminded jurist could agree that those arguments did not involve an unreasonable application of clearly established Supreme Court precedent.  *Richter*, 562 U.S. at 102.

> "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." [*Strickland*], at 690-691, 104 S.Ct. 2052.

*Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003).

At trial, Diana testified that she deleted text messages to and from Petitioner. (Rta4, Dkt. No. 10-57 at 67-68.)  She testified that Petitioner sent emails to her about when he was coming home or asking what she was doing, but nothing of a sexual nature.  (*Id.* at 69.)  She received these emails on a computer at her mom's house, and her mother never looked at her emails.  (*Id.*)  Petitioner testified at the PCR evidentiary hearing that Diana was not texting him about sexual things or encounters that she wanted to have with him.  She was just annoying him by using all of the

storage space on his phone with texts asking about how he was and what he was doing at work.  He had to delete the messages to have room for messages from his wife in case the baby had an emergency.  (Rta11, Dkt. No. 10-64 at 24-25.)

Petitioner has not identified the content of any text or email contained on the phones or computer in his possession that would support his defense that Petitioner was stalking him, making unwanted sexual advances toward him, or threatening to falsely accuse him of sexual molestation.  Diana did not deny that she was sending many text messages to Petitioner and was punished by her parents for it, although she testified that Petitioner was also texting her.  Because Petitioner and Diana deleted the text messages, and Diana testified there was nothing sexual in the emails, there is nothing in the record to suggest there was exculpatory evidence on the phones or computer in Petitioner's possession.  *See White v. United States*, 852 F. App'x 434, 442 (11th Cir. 2021) (finding the petitioner failed to prove prejudice from trial counsel's failure to present a forensic computer expert).  The Appellate Division could have reasonably concluded that defense counsel's performance was not deficient by failing  to examine the cell phones and computer in Petitioner's possession, and failure to examine the phones and computer did not prejudice the defense.  Therefore, a fairminded jurist could agree with the Appellate Division's rejection of this ineffective assistance of counsel claim under the *Strickland* test.

## C.     Ground Two of the Petition

For his second ground for relief, Petitioner argues that the State failed to prove the *actus reus* or *mens rea* elements of the offenses beyond a reasonable doubt.  (Pet.,

Dkt. No. 1 at 14.)  Petitioner relies primarily on the lack of physical evidence, the uncertainty of J.E.'s testimony of what she saw on September 9, 2006, his own testimony, and all inferences the jury could have drawn in favor of the defense.  (*Id.* at 14-15.)  Respondents oppose relief on Ground Two of the petition because the State proved all elements of Petitioner's crimes beyond a reasonable doubt.[3] (Answer, Dkt. No. 10 at 49-52.)  Respondents assert that the State was not required to prove or disprove many of the facts that Petitioner argues were unsupported or undisputed, such as the existence of a mutual love affair between himself and Diana, the existence of any sexually explicit emails or text messages between them, the credibility of Diana's inconsistent statements to police, and evidence of his appropriate behavior as a husband and father.  Respondents argue the element of intent was proven by Diana's testimony, which was credited by the jury.  In his reply brief, Petitioner contends there was insufficient evidence to support Diana's testimony that they engaged in sexual acts every other weekend for five years.

---

[3] Respondents also claimed Petitioner relied solely on state law in presenting this claim to the state courts.  Petitioner raised this claim on direct appeal under the heading:  "TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO HAVE THE VERDICT SET ASIDE AS AGAINST THE WEIGHT OF THE EVIDENCE."  (Ra10, Ra11, Ra13, Dkt. NO. 10-13 at 2-3.) However, Petitioner fairly presented a federal due process claim to the Appellate Division by citing to *In Re Winship*, where the Supreme Court held the Fourteenth Amendment Due Process Clause requires proof of each element of a crime beyond a reasonable doubt.  The Appellate Division determined the claim under state law. (Ra13, Dkt. No. 10-15 at 27.)  Where a state court denies some claims but is silent on the reasons for denying a federal claim, the *Richter* rule applies.  *Johnson v. Williams*, 568 U.S. 289, 293.  Therefore, this Court must "determine what arguments or theories … could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  *Richter*, 562 U.S. at 102.

(Reply Brief, Dkt. No. 22 at 99-108.)  Petitioner argues that reasonable doubt exists if the evidence is equal or nearly equal, and the lack of corroboration of Diana's testimony resulted in such a case of reasonable doubt.  (*Id.* at 102, citing *Kamienski v. Hendricks*, 332 F. App'x 740, 750-51 (3d Cir. 2009)).

On direct appeal, the Appellate Division held:

> there is no merit to defendant's contention that the trial judge incorrectly denied his motion to set aside the verdict as being against the weight of the evidence.  The trial judge, applying the appropriate legal standards for a new trial, had ample grounds to conclude that the jury's verdict, when viewing the evidence in the light most favorable to the State, was supported by the record.  There was no clear and convincing [evidence] showing of a miscarriage of justice.  See R. 2:10-1; State v. Sims, 65 N.J. 359, 373-74 (1974).

(Ra13, Dkt. No. 10-15 at 27.)

Habeas review is based on whether the state court's decision involved a reasonable application of clearly established Supreme Court precedent.  The Supreme Court has held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  Here, the trial court provided the elements of the crimes charged in the indictment to the jury.  (Rta6, Dkt. No. 10-59 at 46-61.)  For Count One of the indictment, the State was required to prove that on diverse dates between June 1, 2001 and June 20, 2004 in Pemberton Township, Petitioner was more than four years older than Diana, who was a child of less than 13 years of age, that he fondled

her breasts directly or through clothing for purpose of degrading or humiliating her or sexually arousing or gratifying himself.  Count Two of the indictment was the same, with the exception that the charge was fondling Diana's vagina.  Count Three, endangering the welfare of a child, required the State to prove that on diverse dates between June 1, 2001 and June 20, 2004, in Pemberton Township, Petitioner, having legal duty for the care of or who has assumed responsibility for the care of Diana, a child under the age of sixteen, engaged in sexual conduct that would impair or debauch her morals.  Count 9 was the same crime, for diverse dates between June 1, 2004 through September 8, 2006, and the sexual contact involved fondling Diana's breasts and vagina, digital penetration of Diana's vagina, fellatio and cunnilingus. Count 13 was also for endangering the welfare of a child, for the sexual conduct alleged on September 9, 2006.  Count 10  alleged aggravated sexual assault, with the same elements as Counts 4, 5, and 6, and the alleged assault was vaginal intercourse on diverse dates between June 1st 2001 and September 8, 2006. Count 11 (rubbing penis on breasts) and Count 12 (fondling breasts) are for aggravated criminal sexual contact on Sept. 9 2006, the elements of which are that the defendant commits an act of sexual contact with a victim who was at least 13-years old but less than 16-years old, and the defendant was related to the victim by blood or affinity to the third degree, and the defendant acted knowingly.

Petitioner challenges the sufficiency of evidence of the alleged sexual acts and mens rea element of the crimes.  The trial court charged the jury on the state of mind requirement:

A person acts purposefully with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result. A person acts purposefully with respect to the attendant circumstances if he is aware of the existence of such circumstances or believes or hopes that they exist. "the state of mind, knowledge, purpose, knowing, those definitions don't change throughout the entirety of the discussion I'm having with you as to the law that applies here." "As to knowing, a person acts knowingly with respect to a result of his conduct or the attendants [sic] circumstances if he is aware that his conduct is of that nature or that such circumstances exist or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. … Purpose and knowing are conditions of mind. They can't be seen. Often they can only be determined by inferences from conduct, words or acts. A state of mind is rarely susceptible of direct proof but must ordinarily be inferred from the facts. Therefore, it is not necessary that the State produce witnesses to testify that an accused said that he had a certain state of mind when he did a particular thing. You may find that such proof has been furnished beyond a reasonable doubt by inferences which may arise from the nature of his acts and conduct, from all he said and did at the particular time and place and from all surrounding circumstances established by the evidence.

(Rta6, Dkt. No. 10-59 at 48-49.)

"[A] victim's testimony alone is sufficient to persuade a reasonable jury of the defendant's guilt beyond a reasonable doubt." *United States v. Parshall*, 600 F. App'x 485, 488 (8th Cir. 2015) (quoting *United States v. Gabe*, 237 F.3d 954, 961 (8th Cir. 2001). Diana's testimony provided evidence of each element of the charged crimes. Diana testified that Petitioner instigated a sexual relationship with her at age ten, she specifically described each sexual act charged in the indictment, and testified that

these acts occurred on diverse dates when she was between the ages of ten and fifteen.  This  was partially corroborated by J.E.'s testimony of finding Diana and Petitioner engaged in a sexual act on September 9, 2006.

Based on common sense experience, the jury could have reasonably credited Diana and J.E.'s testimony over Petitioner's testimony that J.E. witnessed Diana painfully grabbing his crotch, which rendered him speechless in the face of accusations that he was having oral sex with Diana, that he never had any sexual contact with Diana, but she had been making unwanted sexual advances toward him and threatened to falsely accuse him of sexual molestation, although he never told this to anyone until the incident on September 9, 2006.  Diana's description of her sexual relationship with Petitioner, and of Petitioner's professions of love to her, which caused her to believe he would someday leave her mother and marry her and caused her to hide the nature of their relationship, were sufficient to establish Petitioner acted knowingly or purposefully with respect to the various counts in the indictment.  This argument could have supported the Appellate Division's denial of Petitioner's due process claim, and a fairminded jurist could agree that denial of this claim did not involve an unreasonable application of the holding in *In re Winship*.  *See United States v. Goodhouse*, 81 F.4th 786, 790 (8th Cir. 2023) (quoting *United States v. Seibel*, 712 F.3d 1229, 1237 (8th Cir. 2013) (citation omitted) ("[e]ven in the face of inconsistent evidence, a victim's testimony alone can be sufficient to support a guilty verdict."))

### D.    Ground Three of the Petition

In his third ground for relief, Petitioner alleges the prosecutor violated his right to due process by constructively amending the indictment by bringing forth additional allegations after he rejected the State's plea offer and committed to going to trial.  (Pet., Dkt. No. 1 at 16-17.)  In support of this claim, Petitioner contends the "diverse dates" of his alleged criminal activity in the indictment were based on statements made by Diana on September 11, 2006, and November 1, 2006.  Petitioner's alibi defense was tailored to these statements, and his rejection of the State's plea offer was premised on his alibi.  On December 18, 2007, however, the State notified defense counsel that Diana had disclosed more allegations, some of which were not charged because they occurred in different jurisdictions.  (*Id.*, *see also* Reply Brief, Dkt. No. 22 at 108-119.)  Diana testified about some of these new allegations at trial, without objection by defense counsel.  (Pet., Dkt. No. 1 at 17-18.)

Respondents oppose relief because the State did not amend the indictment in contravention of federal law.   (Answer, Dkt. No. 10 at 52-62.)  In summary, Respondents contend the State made only technical amendments to the indictment, and the jury convicted Petitioner only of the crimes charged in the indictment.

Petitioner exhausted this claim in his second petition for post-conviction relief.  (Pet., Dkt. No. 1 at 17.)  Habeas review is of the highest reasoned state court determination of this claim, the Appellate Division's denial of Petitioner's second PCR appeal.  The Appellate Division determined this claim as follows.

Defendant was charged in a thirteen-count indictment with sexual assault, sexual contact, and endangering-the-welfare-of-a-child offenses. The victim of the alleged offenses is defendant's stepdaughter, D.E., who was between ages ten and fifteen when the offenses occurred. The indictment alleged three of the offenses were committed on September 9, 2006, and the remaining ten offenses were committed on numerous occasions between other specified "diverse dates." The indictment further alleged the offenses were committed in Pemberton Township, and the evidence presented to the grand jury showed D.E. reported the crimes were committed during D.E.'s visits to the Pemberton home defendant shared with D.E.'s mother.

Prior to trial, the State moved to amend the indictment to correct what were described as clerical errors. The proposed amendments narrowed the diverse dates during which it was alleged defendant committed some of the alleged offenses, and more specifically alleged defendant was D.E.'s stepfather. Defendant's trial counsel did not object to the requested amendments, and the court granted the State's motion. Prior to trial, the State also advised defendant's trial counsel it intended to move to amend the indictment to allege some of the offenses were committed at a location outside of defendant's Pemberton residence. More particularly, the State advised D.E. had just reported one of the sexual assaults took place at a Westampton Township motel, and the State intended to move "at trial to amend the jurisdictions alleged in the indictment to include 'Pemberton Township (as it currently reads) and/or Westampton Township.'" The State never moved to amend the indictment to include Westampton as a location of any of the alleged offenses. However, at trial, D.E. testified without objection concerning defendant's commission of a sexual assault in Westampton. She also testified defendant committed the offenses charged in the indictment at defendant's Pemberton residence. Following presentation of the evidence, the judge charged the jury on the elements of the charged offenses. For each of the offenses charged in the indictment, the judge instructed the jury to determine whether defendant committed the crimes

in Pemberton. The judge did not request or require the jury determine whether defendant committed any of the offenses in Westampton.

The jury convicted defendant of two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b); three counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a); four counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(a) and (c); and four counts of third-degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a). The jury found beyond a reasonable doubt each offense was committed in Pemberton, as charged in the indictment.

. . .

In Point I, defendant argues the indictment alleged he committed all of the charged offenses in Pemberton, but the State constructively amended the indictment by introducing D.E.'s testimony he committed a sexual assault at a Westampton motel. Defendant argues the purported constructive amendment deprived him of his right to have a grand jury determine the charges and further deprived him of a fair trial because he was not adequately advised of the charges against him. Defendant recognizes the State never moved to amend the indictment to allege he committed any offenses in Westampton. He claims, however, the State constructively amended the indictment by introducing evidence—D.E.'s testimony—that a sexual assault occurred at a Westampton motel.

Relying on federal precedent, defendant claims an unconstitutional constructive amendment of an indictment occurs when "evidence, arguments, or the [] court's jury instructions effectively 'amend[] the indictment by broadening the possible bases for conviction from that which appeared in the indictment.'" *United States v. McKee*, 506 F.3d 225, 229 (3d Cir. 2007) (quoting *United States v. Lee*, 359 F.3d 194, 208 (3d Cir. 2004)); *see also Stirone v. United States*, 361 U.S. 212, 218-19, 80 S. Ct. 270, 4 L.Ed. 2d 252 (1960).

"An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." *United States v. Daraio*, 445 F.3d 253, 259-60 (3d Cir.2006) (footnote omitted); *see also United States v. Thomas*, 274 F.3d 655, 670 (2d Cir. 2001) (explaining an unconstitutional constructive amendment of an indictment occurs where the court's action creates "a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment"). As the court noted in *McKee*, where "the government can show with certainty that the jury did not convict" based on the evidence the defendant claims resulted in the constructive amendment, no reversal of the defendant's conviction is required. 506 F.3d at 231.

Here, there was no constructive amendment of the indictment to include the commission of the sexual assault in Westampton. As noted, the jury was instructed to determine whether defendant committed each of the offenses in Pemberton, and the jury determined beyond a reasonable doubt defendant committed each offense in Pemberton, as charged in the indictment. The record therefore establishes with certainty the jury convicted defendant solely of offenses committed in Pemberton, and D.E.'s testimony about the Westampton sexual assault did not result in a conviction for an offense not charged in the indictment. *See ibid.* For that reason alone, we reject defendant's claim he was denied a fair trial by any purported unconstitutional constructive amendment of the indictment.

We are further unpersuaded by defendant's reliance on our Supreme Court's decision in *State v. Dorn*, 233 N.J. 81, 182 A.3d 938 (2018). In pertinent part, the Court addressed the circumstances under which an indictment may properly be amended pursuant to Rule 3:7-4. *Id.* at 94-96. The Court held an indictment may not be amended where "an amendment goes to the core of the offense[,] . . . where it would prejudice a defendant in presenting his or her

defense," *id.* at 95, or where the amendment charges "a more serious offense," *id.* at 96. The Court's holding is inapposite here because there was no actual amendment of the indictment and no constructive amendment resulting in the jury's determination of any charges other than those in the indictment. The indictment charged defendant with committing the offenses in Pemberton, and the jury found he committed the offenses for which he was convicted in Pemberton.

We also reject defendant's claim because it is barred under Rule 3:22-5, which provides "[a] prior adjudication upon the merits of any ground for relief is conclusive whether made in the proceedings resulting in the conviction or in any post-conviction proceeding, . . . or in any appeal taken from such proceedings." "[A] prior adjudication on the merits ordinarily constitutes a procedural bar to the reassertion of the same ground as a basis for post-conviction review." *State v. Preciose*, 129 N.J. 451, 476, 609 A.2d 1280 (1992) (citing R. 3:22-5). "[A] defendant may not use a petition for post-conviction relief as an opportunity to relitigate a claim already decided on the merits." *State v. McQuaid*, 147 N.J. 464, 483, 688 A.2d 584 (1997) (citation omitted).

On his direct appeal from the denial of his first PCR petition, defendant argued his trial counsel erred by failing to challenge the purported constructive amendment of the indictment and D.E.'s testimony about the Westampton sexual assault. He also argued the amendment and testimony resulted in a denial of his right to due process and a fair trial. We rejected the argument, finding it lacked sufficient merit to warrant discussion in a written opinion. *G.L.D.*, No. A-1740-13, 2016 N.J. Super. Unpub. LEXIS 591 slip op. at 11. The argument we rejected is substantially similar to, if not identical to, the argument defendant currently makes in Point I of his brief on appeal. *See State v. Marshall*, 173 N.J. 343, 351, 801 A.2d 1142 (2002) (explaining Rule 3:22-5 bars reconsideration on a second PCR petition of a claim that is "identical or 'substantially equivalent'" to a claim adjudicated in a first PCR petition). The argument is therefore barred under Rule 3:22-5.

(Ra42, Dkt. No. 10-44.)

The Appellate Division relied primarily on Third Circuit precedent and state law in denying this claim. Habeas review requires this Court to determine clearly established Supreme Court precedent governing the claim. In *United States v. Miller*, the Supreme Court explained that "a number of longstanding doctrines of criminal procedure are premised on the notion that each offense whose elements are fully set out in an indictment can independently sustain a conviction." 471 U.S. 130, 136 (1985) (citations omitted). "Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment." *Id.* To establish violation of the "substantial right to be tried only on charges presented in an indictment returned by a grand jury[,]" a petitioner must show that he may have been convicted of an offense not charged in the indictment. *Id.* at 138-39.

The Appellate Divison's denial of this claim involved a reasonable application of the holding in *Miller*, that for relief on a claim of constructive amendment of an indictment, a petitioner must show that he may have been convicted of an offense not charged in the indictment. The Appellate Division acknowledged that although Petitioner was not indicted for any crime that occurred in Westampton, Diana testified that they engaged in a sexual act in a motel in Westampton on one occasion. The Appellate Division found Petitioner could not have been convicted for sexually assaulting Diana in Westampton because the indictment charged only acts that

occurred in Pemberton, and the trial judge specifically inquired whether the jury found that each crime occurred in Pemberton.  The indictment (Ra1, Dkt. No. 10-1) and trial transcript of the jury charge and jury's verdict (Rta6, Dkt. No. 10-59 at 46, 61, 66-70) support the Appellate Division's determination of the facts.  Therefore, this claim is denied.

### E.   Ground Four of the Petition

For his fourth ground for relief, Petitioner asserts he was denied his Fourteenth Amendment right to due process when the PCR court limited the issues of his evidentiary hearing.  (Pet., Dkt. No. 1 at 18.)  Petitioner submits that he raised more than thirty ineffective assistance of counsel claims in his PCR proceedings, but the PCR court limited the evidentiary hearing solely to defense counsel's failure to obtain Petitioner's work and family psychotherapy records.  Respondents oppose relief because federal habeas review is limited to deciding whether a state court conviction violated the Constitution, laws, or treaties of the United States.  (Answer, Dkt. No. 10 at 62-64.)  Respondents submit that whether Petitioner was entitled to an evidentiary hearing on post-conviction review is governed by the New Jersey Court Rules, specifically R. 3:22-10, not federal law.

Respondents are correct.  Under New Jersey state law, evidentiary hearings are held at the discretion of the PCR court, when necessary to determine a material issue of fact or when the defendant has presented a prima facie ineffective assistance of counsel claim.  *State v. Preciose*, 129 N.J. 451, 462 (1992) (citing New Jersey Court Rule 3:22-10.)  Issues of state law are not cognizable on habeas review.  28 U.S.C. §

2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67–68 ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.") Moreover, a federal habeas court is limited to evaluating what occurred in the state proceedings that actually led to the petitioner's conviction; "what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation." *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998). Therefore, this Court denies Ground Four of the petition. Because the Court has determined the unexhausted claim in Ground Five of the petition by separate order, the Court turns to Ground Six of the petition.

### F.    Ground Six of the Petition

For his sixth ground for relief, Petitioner asserts the prosecutor violated his Fifth Amendment right to remain silent by repeatedly commenting on his pre-arrest silence. (Pet., Dkt. No. 1 at 21.) The prosecutor repeatedly questioned Petitioner about his failure to tell the police and his family, before September 9, 2006 and at the time of his arrest, that he never engaged in sexual acts with Diana, and that she had been making sexual advances toward him. The trial court did not give a limiting instruction on Petitioner's silence.

Respondents oppose relief because the prosecutor did not violate Petitioner's Fifth Amendment privilege against self-incrimination under federal law, which is limited to post-arrest silence, and the prosecutor's conduct did not prejudice Petitioner's right to a fundamentally fair trial. (Answer, Dkt. No. 10 at 74-94.) In his reply brief, Petitioner acknowledges that New Jersey law provides greater

protection to pre-arrest silence than the federal privilege. (Reply Brief, Dkt. No. 22 at 130-31.) Thus, Petitioner now relies on the Due Process Clause for relief on a state law violation, which he contends created "a fundamental defect which inherently results in a complete miscarriage of justice" or is "inconsistent with the rudimentary demands of fair procedure." (*Id.* at 131, quoting *Reed v. Farley*, 512 U.S. 339, 348 (1994) (quoting *Hill v. U.S.*, 368 U.S. 424, 428 (1962)).

On his direct appeal, Petitioner relied on state law for his claim that the prosecutor engaged in misconduct by commenting on his pre-arrest silence. (Ra10, Dkt. No. 10-12 at 2.) (*Id.* at 15-21.) The Appellate Division denied this claim under state law. (Ra13, Dkt. No. 10-15 at 13-22.) As noted, Petitioner now invokes the Due Process Clause to argue the prosecutor's violation of state law denied him a fair trial. Errors of state law do not allege a deprivation of federal rights and are not a basis for habeas relief. *See, e.g., Engle v. Isaac*, 456 U.S. 107, 119 (1982) ("Insofar as respondents simply challenge the correctness of the self-defense instructions under Ohio law, they allege no deprivation of federal rights and may not obtain habeas relief.") Therefore, Petitioner has not raised a cognizable federal claim. This Court denies Ground Six of the petition.

## G.  Ground Seven of the Petition

For his seventh ground for relief, Petitioner claims the prosecutor committed misconduct in violation of Petitioner's right to due process by circumventing the judge's refusal to charge flight by repeatedly referring to Petitioner's flight in her summation. (*Id.* at 22.) In support of this claim, Petitioner explains that the

prosecutor sought a charge of flight as indicating consciousness of guilt. The trial judge denied the request because the alleged flight, leaving the home after being discovered by J.E. in an alleged sexual act with Diana, involved a fairly short departure from the scene of an alleged crime, and the jury charge on flight states "mere departure from a crime scene is not ordinarily considered flight." In her summation, the prosecutor repeatedly referred to Petitioner fleeing the house on the night of his arrest, and suggested that he was fleeing in panic from being caught.

Respondents oppose relief, asserting that the prosecutor fairly summarized the evidence before the jury. (Answer, Dkt. No. 10 at 94-100.) The prosecutor simply summarized Petitioner's actions regarding his departure from the residence. The trial denied the State's request for a jury charge regarding flight:

> The situation that this case poses to the Court is a fairly short period of time of departure from the scene of an alleged crime. If the proposed jury charge did not contain the words mere departure from a crime scene is not ordinarily considered flight, I would have no reluctance at all to provide the jury with that charge but in this case, this was a departure for a very short period of time, he immediately returned after the police told him to return, and I don't see sufficient evidence of purpose to evade an accusation to warrant the administration of that charge to the jury.

(Rta6, Dkt. No. 10-59 at 13-14.)

Habeas review is of the highest reasoned state court determination of this claim. The Appellate Division denied this claim on direct appeal, as follows.

> Defendant next argues that the prosecutor improperly referred in her closing argument to his flight from the residence after his mother-in-law discovered him in a

compromising position with Diana. In particular, defendant criticizes the prosecutor for noting to the jury that defendant had "fled from the house," that he had engaged in a "bizarre flight," and that he was "fleeing from the panic that had set in when he was caught." Defendant argues that these allusions to his departure from the residence were unfair, and that they deprived him of a fair trial. Because no objection to these comments was raised in the trial court, we again evaluate defendant's contentions under a "plain error" review standard. See Macon, supra, 57 N.J. at 337.

To be sure, the trial judge appropriately declined in this case to issue a charge to the jury inviting them to draw on adverse inference from defendant's flight, as there was no specific evidence that defendant had fled from the authorities with a consciousness of his guilt. See State v. Ingram, 196 N.J. 23, 47 (2008) (holding that, in the analogous context of a defendant's absence from trial, a flight charge is unwarranted "unless separate proofs are tendered to sustain the claim that the defendant's absence was designed to avoid detection, arrest, or the imposition of punishment"); see also State v. Mann, 132 N.J. 410, 418-19, 625 A.2d 1102 (1993).

The present scenario is distinctive because it concerns a defendant's flight from his own residence, after being confronted by his mother-in-law about apparently molesting his stepdaughter. There was nothing improper in allowing the jury to consider the significance of defendant's sudden departure, as bearing upon his overall state of mind and in weighing his claim that he had been manipulated by the child and had been the target of false accusations. If, as defendant maintains, his observed physical encounter with Diana in the living room was totally benign, one could reasonably wonder why he left the premises abruptly with a knife, rather than attempt to explain to his wife and mother-in-law what had occurred.

The prosecutor did not impermissibly argue to the jury that defendant left the residence "with an intent to avoid apprehension for [a] crime." See Ingram, supra, 196 N.J.

at 46 (quoting State v. Wilson, 57 N.J. 39, 49, 269 A.2d 153 (1970). Rather, the prosecutor alluded to defendant's departure as part of the overall sequence of events, in an effort to portray defendant's benign narrative as beyond belief. We regard the prosecutor's comments as within the bounds of fair advocacy, and conclude that they were based upon inferences that can be "reasonably drawn" from the evidence. See State v. Morton, 155 N.J. 383, 457, 715 A.2d 228 (1998). There was no error, much less plain error, by the court's allowance of these closing arguments. No new trial is warranted. State v. G.L.D., No. A-4122-08T4, 2011 N.J. Super. Unpub. LEXIS 1469, at *22-24 (App. Div. 2011).

(Ra13, Dkt. No. 10-15 at 22-24.)

The State relied on state law in denying this claim of prosecutorial misconduct. Under federal law, the Supreme Court has long held that "the relevant question" for a prosecutorial misconduct claim "is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). In *Darden*, the Court held that prosecutor's conduct did not result in a fundamentally unfair trial, taking into consideration that: (1) the prosecutor's argument did not misstate the evidence or implicate other specific rights of the accused; (2) much of the objectionable content of the prosecutor's summation was invited by the defense; and (3) the trial court instructed the jury that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence.

Those same factors are applicable here. The prosecutor did not argue that Petitioner fled from the police to avoid accusation, but rather that he fled his home in

panic when he was discovered in a compromising position with his minor stepdaughter, which his mother-in-law and his wife believed to have been a sexual act. He returned to the home briefly to obtain a knife, and fled the house again without knowing whether the police had been notified. The prosecutor did not misstate the evidence by using the words "fled" and "flight" to describe Petitioner leaving the home on September 9, 2006 without explanation, nor was it misconduct to argue the reasonable inference that Petitioner left the home in panic because his sexual activity with his minor stepdaughter had been witnessed by his mother-in-law and disclosed to his wife. The prosecutor's argument was "invited" to impeach Petitioner's testimony that he was not engaged in a sexual act with his step-daughter, but rather, she had painfully grabbed and pulled his crotch, and he was unable to speak due to pain. The undisputed evidence also showed that Petitioner called his home and voluntarily returned after speaking to a police officer who had arrived at the scene. The jury was not misled to believe that Petitioner fled from the police. Finally, the trial court's following instruction cured any potential prejudice from the prosecutor's summation.

> Regardless of what counsel said or what I may have said
> recalling the evidence in this case, it is your recollection of
> the evidence that should guide you as judges of the facts.
> Arguments, statements, remarks, openings and
> summations of counsel are not evidence and must not be
> treated as evidence. Although the attorneys may point out
> to you what they think important in this case, you must
> rely solely upon your understanding and recollection of the
> evidence that was admitted during the trial. Whether or
> not the defendant has been proven guilty beyond a
> reasonable doubt is for you to determine based upon all of

> the evidence presented during the trial. Any comments by
> counsel are not controlling. It is your sworn duty to arrive
> at a just conclusion after considering all of the evidence
> which was presented during the course of the trial.

(Rta6, Dkt. No. 10-59 at 43-44.)  For these reasons, the Appellate Division's denial

of this claim did not involve an unreasonable application of clearly establish

Supreme Court precedent governing prosecutorial misconduct in violation of the

Due Process Clause.  This claim is denied.

### H.    Ground Eight of the Petition

For his eighth ground for relief, Petitioner contends the prosecutor denied his

Fourteenth Amendment right to due process by knowingly soliciting false testimony

from Diana, and failing to correct the false testimony.  (Pet., Dkt. No. 1 at 23.)

Petitioner alleges Diana testified falsely that she had not told Margaret Snyder, her

father's girlfriend, about what was happening between her and Petitioner.  Ms.

Snyder told investigators that Diana talked to her on September 10, 2006, and was

opening up more and more, and talking to her every day.  Ms. Snyder was on the

State's witness list, but the State did not call her to testify.  Defense counsel tried to

subpoena Ms. Snyder after Diana's alleged false testimony, but she had disappeared.

During Petitioner's motion for a new trial, the prosecutor admitted Ms. Snyder had

provided details of some of the allegations in the early part of the investigation.

Respondents oppose relief on this claim because the prosecutor did not elicit

false testimony from the victim and also assisted Petitioner in attempting to

subpoena Ms. Snyder.  (Answer, Dkt. No. 10 at 100-02.)  Ms. Snyder provided a

statement to Detective Ayres and Detective Jay Abadia on September 26, 2010. Therefore, Ms. Snyder was on the prosecution's witness list.  The State subpoenaed Ms. Snyder, and she complied with the subpoena by appearing for court on January 24, 2008.  The State decided not to call her as a witness and told her so on that day, not knowing the defense wanted to call her as a witness.  The defense unsuccessfully sought to subpoena Ms. Snyder for five days before the end of trial.  The State attempted to contact Ms. Snyder to assist the defense in serving the subpoena, but the State was not able to reach her.  Respondents argue that the prosecutor would not have any knowledge of whether Diana's testimony about her conversations with Ms. Snyder were true.  Therefore, there was no prosecutorial misconduct.

In his reply brief, Petitioner notes the Appellate Division summarily denied this claim on direct appeal.  (Reply Brief, Dkt. No. 22 at 143.)  Petitioner argues the State knew Diana's testimony was false because Ms. Snyder had given detectives a taped statement.  In her statement, Ms. Snyder said that she was the first person Diana spoke to about Petitioner's abuse.  Petitioner contends that the prosecutor knew about Ms. Snyder's statement because it was made a part of the record. Therefore, the State knowingly used Diana's false testimony.

The *Richter* rule applies because the Appellate Division summarily denied this claim as without merit.  Therefore, this Court must determine any reasonable argument supporting the state courts' denial of this prosecutorial misconduct claim. 562 U.S. at 102.  "[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."

*Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959)  (citing *Alcorta v. State of Texas*, 355 U.S. 28, 78) (additional citations omitted).  Prejudice, however, is not presumed. "[T]he standard of review applicable to the knowing use of perjured testimony is equivalent to the *Chapman* harmless-error standard."  *United States v. Bagley*, 473 U.S. 667, 680 (1985).  The standard announced in *Chapman* is that before a federal constitutional error can be held harmless, the court must be able to "declare a belief that [the error] was harmless beyond a reasonable doubt."  *Chapman v. California*, 386 U.S. 18, 24 (1967).

        The State courts could reasonably have rejected this claim because the State had no reason to know who was telling the truth about their conversations, Diana, who said she did not tell Ms. Snyder about the details of her sexual relationship with Petitioner, or Ms. Snyder, who said Diana began to disclose information to her on September 10, 2006, and disclosed "more and more" over time.  *See Lambert v. Blackwell*, 387 F.3d 210, 249 (3d Cir. 2004) ("There are many reasons testimony may be inconsistent; perjury is only one possible reason.")  Even assuming the prosecutor had reason to question whether Diana lied about not telling Ms. Snyder the details of Petitioner's sexual abuse, the State did not fail to disclose Ms. Snyder's statement as possible impeachment evidence.

        Even if there was misconduct by the prosecutor, it was harmless beyond a reasonable doubt.  The defense had little to gain by impeaching Diana for lying about whether she had disclosed details of Petitioner's sexual abuse to Ms. Snyder. The jury was likely to find Petitioner's disclosure of details of the abuse to Ms.

Snyder more incriminating than the fact that Diana lied about making such disclosures.  Therefore, even assuming the State knew of and failed to correct Diana's false testimony, the error was harmless beyond a reasonable doubt.  There was a reasonable basis for the Appellate Division to summarily deny Petitioner's prosecutorial misconduct claim, and a fairminded jurist could agree that the Appellate Division's denial of this claim did not involve an unreasonable application clearly established Supreme Court precedent.  This habeas claim is denied.

## IIV.   CERTFICATE OF APPEALABILITY

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. 28 U.S.C. § 2253(c)(1). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. For the reasons discussed above, reasonable jurists would not find denial of the habeas petition debatable.  Accordingly, no certificate of appealability shall issue.

## V.   CONCLUSION

Petitioner has not established his burden to show the state courts' determination of his federal claims were contrary to, or involved an unreasonable application of, clearly established Federal law, or that the state courts' determination of his federal

claims were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.  Therefore, the Court will deny the habeas petition, and no certification of appealability shall issue.

An appropriate Order follows.


**Date:  November 1, 2023**

s/Renée Marie Bumb
RENÉE MARIE BUMB
Chief United States District Judge
